# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs March 1, 2016

## STATE OF TENNESSEE v. ANMICHAEL LEONARD

**Appeal from the Criminal Court for Shelby County**
**No. 13-03635    Chris Craft, Judge**

---

### No.  W2015-01313-CCA-R3-CD  -  Filed April 12, 2016

---

The Defendant, Anmichael Leonard, was convicted by a Shelby County Criminal Court jury of theft of property valued at $1000 or more but less than $10,000, a Class D felony, identity theft, a Class D felony, and fraudulent use of a credit card, a Class A misdemeanor. *See* T.C.A. §§ 39-14-103 (2014) (theft of property); 39-14-150 (2012) (identity theft); 39-14-118 (2014) (unauthorized use of a credit or debit card).  The trial court sentenced the Defendant to an effective twenty-four years.  On appeal, the Defendant contends that the evidence is insufficient support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J. joined.

Stephen C. Bush, District Public Defender, and Barry W. Kuhn (on appeal) and Trent Hall (at trial), Assistant Public Defenders, for the appellant, Anmichael Leonard.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; Alexia Crump, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the theft of several items from a hotel room in Memphis. At the trial, Darin Pettit testified that he lived in Missouri and that on December 2, 2011, he arrived in Memphis with his wife and son to participate in the St. Jude marathon.  He said that they stayed at a downtown hotel.  Mr. Pettit stated that on December 4, he left his hotel room between 7:45 and 8:00 a.m. to eat breakfast in the lobby, that he sent Ms. Pettit a text message at about 8:20 a.m. asking her and their son

to join him, that they spent twenty minutes together in the lobby eating, and that when they returned to their hotel room, he noticed items were missing. Mr. Pettit said that Ms. Pettit's iPhone, purse, and wallet, his son's iPod and red baseball cap, and Mr. Pettit's work iPhone, blue jeans, and a bottle of cologne were missing. He said no one had permission to be in his hotel room. He said that because Ms. Pettit did not know whether he had the room key, she left the door ajar when she left the room to go to breakfast. Mr. Pettit said the door was ajar when they returned.

Mr. Pettit testified that he reported the missing items to hotel security, that hotel security contacted the police, and that a police officer came to the hotel. Mr. Pettit said that his and his wife's iPhones were valued at $300 each, his son's iPod was valued at $150, the blue jeans were valued between $90 and $110, the baseball cap was valued between $10 and $15, the purse was valued between $80 and $100, and he speculated that the cologne was valued between $40 and $50. He said that the purse contained prescription medication, about $40 cash, his wife's wallet, and personal items. Mr. Pettit estimated the total value of the missing items between $1200 and $1300.

Mr. Pettit testified that a tracking application was installed on both his work iPhone and his wife's iPhone, that he used his personal iPhone to cancel his credit and debit cards while he spoke to the police officer, and that a friend used her cell phone to utilize the tracking application and find the Global Positioning System (GPS) coordinates of the phone. Mr. Pettit said that the first location identified by the application was a Kroger grocery store "south and a little west of the hotel." Mr. Pettit stated that he requested the police respond to the location, but the police did not have an available car. Mr. Pettit said that the tracking application reflected the missing iPhone had moved to an address associated with a bail bonding company, that the police were not able to respond to the address, and that Mr. Pettit, his family, and several other people including Douglas McDaniel drove to the address to recover the missing items. Mr. Pettit stated that they left the hotel between 10:45 and 11:00 a.m.

Mr. Pettit testified that upon their arrival at the address five to eight minutes later, the tracking application reflected the iPhone was located behind the bonding company. Mr. Pettit said that he walked to the rear of the building and searched unsuccessfully in a dumpster for the items. He said that he called the police and reported he believed he had located his items. Mr. Pettit stated that he and Mr. McDaniel watched the doors of the bonding company for fifteen to twenty minutes, that the tracking application registered movement, and that Mr. Pettit saw a man, later identified at the Defendant, walking down the street wearing a red baseball cap and carrying a black garbage bag over his shoulder. Mr. Pettit said his "best guess at the time" was that his iPhone was inside the bag or with the Defendant, that the Defendant was the only person on the street, and that Mr. Pettit recognized his son's baseball cap

because it was custom-made with the letter J on the brim and the initials of a St. Jude's patient on the back.

Mr. Pettit testified that he and Mr. McDaniel followed the Defendant for one or two blocks until the Defendant entered a second bonding company. Mr. Pettit said that he and Mr. McDaniel conferred, that Mr. McDaniel stayed to watch the Defendant, and that Mr. Pettit returned to the first bonding company to meet the police. Mr. Pettit said that two officers arrived, that he explained the situation to the officers, and that he and the officers went to the second bonding company. Mr. Pettit said that Mr. McDaniel indicated the Defendant was still inside the building, that Mr. Pettit, Mr. McDaniel, and the officers entered the building, and that after investigating, the missing items were recovered from the black bag.

Mr. Pettit testified that upon entering the building, he saw the Defendant with the baseball cap beside him. Mr. Pettit said that the police asked an employee whether the black bag was his, and the employee told them the bag belonged to the Defendant. Mr. Pettit stated that they found both iPhones, the iPod, Ms. Pettit's wallet with "most of her identification," and credit cards. Mr. Pettit stated that he saw the items in the bag, that he identified the items as his, and that the police arrested the Defendant. Mr. Pettit said that the Defendant was arrested around noon.

Mr. Pettit testified that the baseball cap was next to the Defendant in the backseat of the police cruiser. Mr. Pettit said that he had never seen the Defendant before and that the Defendant did not have permission to be in Mr. Pettit's hotel room, to be in possession of Mr. Pettit's items, or to use his credit or debit cards.

Mr. Pettit said that before Ms. Pettit's purse was stolen, it contained a Bank of Missouri MasterCard debit card, a Police Credit Union debit card, her driver's license, her Social Security card, and "probably" a Southwest Airlines credit card. Mr. Pettit testified that he noticed unauthorized charges when he reviewed his next bank statement, that two December 4 charges were made at a Kroger grocery store using the Bank of Missouri debit card, and that Mr. Pettit did not authorize those charges. Mr. Pettit said he saw a red gift bag inside the Defendant's garbage bag. Mr. Pettit identified the red bag.

On cross-examination, Mr. Pettit testified that he used a friend's cell phone and later his personal iPhone to track Ms. Pettit's iPhone. Mr. Pettit said that the tracking application displayed a map and showed the location of the iPhone, and that he used another friend's cell phone to navigate to the location displayed. He stated that the red baseball cap drew his attention to the Defendant. Mr. Pettit said that his car and an additional car drove to the first bonding company. He stated that he and Mr. McDaniel

never entered the first bonding company and that the police entered the second bonding company before Mr. Pettit and Mr. McDaniel entered.

Mr. Pettit testified that both Ms. Pettit's debit card and the Southwest Airlines credit card were used after they were taken. Mr. Pettit said that his blue jeans, Ms. Pettit's purse, and Ms. Pettit's prescription medications were not recovered. Mr. Pettit did not remember whether the cologne was recovered. Mr. Pettit said that he did not notice surveillance cameras in the hotel and that the hotel manager told him that the hotel did not have surveillance cameras.

Memphis Police Officer Nikki Russell testified that on December 4, 2011, she and her partner responded to a call in which the victim of a burglary had tracked his stolen property and requested assistance. Officer Russell said that when she arrived around 10:00 a.m., Mr. Pettit explained what had happened, where Mr. McDaniel was, and gave a physical description of the man they observed. Officer Russell stated that she went to Mr. McDaniel's location, that it was raining heavily, and that the streets were "fairly clear."

Officer Russell testified that she entered a bonding company, she saw the Defendant standing near the door and that the Defendant matched Mr. Pettit's description. Officer Russell said that Mr. Pettit told her the man he saw was carrying a black garbage bag and a red bag. Officer Russell said that a black garbage bag was next to the Defendant on a sofa and a red gift bag was under a chair nearby. She said that the Defendant was wearing a black jacket and dark pants and that the Defendant denied having a weapon, although Officer Russell later took a knife from him. Officer Russell said that while she searched the Defendant for weapons, Mr. Pettit "recovered" items inside the bags and identified them as his. She returned the items to Mr. Pettit. She said that she arrested and transported the Defendant to the police station.

Officer Russell testified that the black bag contained "various perishable goods," including shrimp, and that the red bag contained cell phones, chargers, an iPod, "cards," and Mr. Pettit's money.

Officer Russell testified that the Defendant had a Kroger receipt in his hand when she placed him in custody and that Mr. Pettit told her a representative from his bank reported a recent purchase at Kroger from Mr. Pettit's account. She noted Mr. Pettit contacted his bank from another cell phone. The Kroger receipt, which had faded with time, and a prior photocopy of the receipt were received as an exhibit. It reflected a total purchase on December 4, 2011, of shrimp, catfish, and ground beef totaling $198.07 and charged to a MasterCard with the last four digits 4923.

Autumn Pettit testified that she went to Memphis for the St. Jude marathon weekend and that she stayed in a hotel with Mr. Pettit and their son. She said that on December 4, between 8:30 and 8:45 a.m., she left the hotel room with her son to meet Mr. Pettit for a cup of coffee, and that when she returned, she noticed items missing from the room. She stated that no one was in the room when she left and that she left the door "cracked with the lock bolt propping the door open" because she did not have a key. She said that when viewed from the outside, the door appeared closed except for a "slight crack" where the door was propped open. She stated that she was away from the room for fifteen minutes and that when she returned, the door remained ajar.

Ms. Pettit testified that her iPhone, her purse, Mr. Pettit's work iPhone, another iPhone, and an iPod were missing. She said that she paid $200 for her purse and $500 for the iPhone. She stated that her wallet, two debit cards, two credit cards, her Social Security card, and prescription medications were inside the purse. She said that she spoke to hotel security and a police officer and that Mr. Pettit, a family friend, and Ms. Pettit used a tracking application to track Ms. Pettit's iPhone. Ms. Pettit stated that they contacted the police department with the iPhone's location and that she, Mr. Pettit, their son, Mr. McDaniel, his wife, and two other people drove to the iPhone's location in two vehicles. She said that they drove between five and ten minutes and that the location identified by the tracking application was beside a bonding company and across the street from a gas station.

Ms. Pettit testified that they saw a man wearing a black leather coat and a red baseball cap walking down the street carrying a black garbage bag and a red bag. She said the weather was overcast and "chilly" with misting rain. She stated that she had never seen the man before and that the baseball cap drew her attention because it belonged to her son. She said she knew it was her son's baseball cap because the cap had the letter J on the front and the letters B.G. on the back, representing the name of the marathon team. She stated that the man was between thirty and forty feet away, that she observed him from inside her car, and that she had no problem seeing him clearly.

Ms. Pettit testified that the man entered the bonding company, that Mr. Pettit parked and exited the car, that the man emerged from the bonding company without the black and red bags, that police officers approached the man, and that the officers brought the bags outside. She said that the red bag contained her iPhone and driver's license, Mr. Pettit's iPhone, her son's iPod, and a bottle of cologne and that the police returned the property to her. She stated that her debit cards, credit cards, and purse were not recovered.

Ms. Pettit testified that no one had permission to use her credit and debit cards and that after the cards were stolen, she noted four or five unauthorized charges on her credit and debit card statements. She said that the last four digits of her debit card were

4923. She identified the Kroger receipt and said that it reflected a purchase made with a MasterCard ending in 4923, which number matched her stolen debit card.

Douglas McDaniel testified that Mr. Pettit was his coworker and neighbor and that in December 2011, Mr. McDaniel came from Missouri to Memphis for the St. Jude marathon. Mr. McDaniel said that he stayed at the same hotel as Mr. and Ms. Pettit and that on December 4, Mr. McDaniel spoke with Mr. Pettit in the hotel lobby. Mr. McDaniel said that he and Mr. Pettit used one of Mr. Pettit's iPhones to track the missing iPhone, that they noticed the tracking application showed the missing iPhone was moving slowly, and that this signified the person with the iPhone was walking. Mr. McDaniel stated that around 8:30 a.m., he and his family and Mr. Pettit and his family left the hotel in their respective vehicles and drove to the iPhone's location about five to seven minutes away.

Mr. McDaniel testified that they went to a bonding company, that he kept watch over the back door of the building, that it was raining heavily and that he observed the Defendant walking about 100 feet away. Mr. McDaniel said the Defendant wore a black coat and carried a black garbage bag and a smaller red bag. Mr. McDaniel stated that the Defendant drew his attention because the Defendant did not have an umbrella. Mr. McDaniel said that shortly after seeing the Defendant, Mr. Pettit called Mr. McDaniel's cell phone and told him the tracking application showed the iPhone was moving again. Mr. McDaniel said that the Defendant was the only person on the street and that he had never seen the Defendant previously.

Mr. McDaniel testified that he drove to a second bonding company about one block away, where he observed the Defendant standing inside and alternately looking out the front window and inside the building. Mr. McDaniel stated that they waited about ten minutes for the police to arrive, that he watched the Defendant from his car, and that the Defendant paced in front of the window and turned around to talk to someone inside the building. Mr. McDaniel said that he did not see the black and red bags again until he and Mr. Pettit entered the building with the police, that the bags were about six feet from the Defendant, that a bonding company employee was talking on the telephone, that the police officers engaged the Defendant in conversation, and that Mr. Pettit looked inside the bags.

Mr. McDaniel testified that the bags contained most of Mr. Pettit's items, that the police officers arrested the Defendant, that the bags were brought outside, and that most of the items were returned to Mr. Pettit. Mr. McDaniel said that Mr. Pettit found a red baseball cap in the "small of the defendant's back" with a black J representing a team that Mr. Pettit coached and the initials B.G., representing the name of a child who died of cancer, in whose memory the group ran the marathon.

Larry Eaves testified that he was an investigator for the District Attorney's Office and that he worked on the Defendant's case. He said that he contacted the hotel in April and May 2012 and that the hotel told him no surveillance footage was available because surveillance videos were only preserved for thirty days.

Memphis Police Officer Brooke McKenzie testified that on December 4, 2011, she went to the second bonding company to assist Officer Russell. Officer McKenzie said that she searched the area for Mr. Pettit's belongings and found a red gift bag in a dumpster that had been within the Defendant's arm's reach. Officer McKenzie identified the red bag. Officer McKenzie stated that one of the officers handed her a key card, which was found when the Defendant was searched, and that she took the card back to the hotel. She said that she learned from hotel staff that the key was blank and that she left the key with the hotel. Officer McKenzie stated that at the hotel, she watched a video recording of surveillance footage, that it showed the Defendant's entering and exiting the hotel, that she recognized the Defendant because his clothes and baseball cap matched the man who had been arrested, that she did not remember what the Defendant wore in the recording, and that she attempted to obtain a copy of the recording, but the hotel employees did not know how to copy the recording.

On cross-examination, Officer McKenzie testified that she picked up the red bag next to the dumpster outside the bonding company. She said that the surveillance video recording showed the Defendant's entering and exiting the hotel, not the Pettits's hotel room. She stated that she inquired as to the placement of surveillance cameras in the hotel's hallways but that the hotel did not have cameras in the hallways. She agreed that her description of the man in the recording was based upon his clothing, not his face.

Upon this evidence, the Defendant was convicted of theft of property valued at $1000 or more, identity theft, and fraudulent use of a credit card.[1] The Defendant was sentenced as a career offender to twelve years each for theft and identity theft. He was also sentenced to eleven months, twenty-nine days for fraudulent use of a credit card. The trial court ordered consecutive service of the theft and identity theft sentences, for an effective sentence of twenty-four years. This appeal followed.

## Sufficiency of the Evidence

The Defendant argues the evidence is insufficient to support his convictions. The State responds that the evidence is sufficient. We agree with the State.

---

[1] The jury was unable to reach a verdict on Count 1 of the indictment, aggravated burglary, and the State subsequently dismissed the charge.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

**A.**

**Theft of Property Valued at $1000 or More but Less Than $10,000**

The Defendant contends relative to the theft conviction that the evidence is insufficient to establish his intent to permanently deprive Mr. and Ms. Pettit of their property, arguing that only a short time passed before the property was recovered and that the property's value was not diminished as a result of the theft. The State responds that the evidence is sufficient, that all the property was not recovered, and that the purchases made with the debit card diminished its value.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). The evidence must show that a defendant "knowingly obtained or exercised control over" the property, "did not have the owner's effective consent," and "intended to deprive the owner of the property." *State v. Amanns*, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). An owner is deprived of property when a defendant "withholds property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." T.C.A. 39-11-106(a)(8)(A)(2012). The intent to deprive may be based solely upon circumstantial evidence, and a "jury may infer a . . . defendant's intent from the surrounding facts and circumstances." *State v. Roberts,* 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996); *see State v. Scates,* 524 S.W.2d 929, 931 (Tenn. 1975).

In the light most favorable to the State, the testimony reflects that Mr. Pettit and Mr. McDaniel observed the Defendant walking down the street and carrying a black garbage bag and a smaller red bag. The tracking application on Mr. Pettit's iPhone generally matched the Defendant's movement between the bonding companies. Mr. Pettit and Mr. McDaniel observed the Defendant walking alone in the street wearing Mr. Pettit's son's baseball cap, which was distinctive due to its custom lettering. When Officer Russell approached the Defendant in the second bonding company, the black and red bags were in the same room as the Defendant, and Mr. Pettit looked inside the bags and identified his items. The Defendant had the Pettits's son's baseball cap next to him in the police car after he was arrested. Ms. Pettit testified that her purse and its contents apart from her driver's license were not recovered, including a debit card. In addition, the Defendant had a Kroger receipt for perishable goods, the Defendant had the goods in the black garbage bag, and the last four digits of the debit card used in the transaction matched the last four digits of Ms. Pettit's missing debit card. Based upon this evidence, a reasonable jury could have determined that the Defendant did not intend to return the items. We note some of the Pettits's belongings were never recovered. The evidence is sufficient to establish the Defendant's intent to deprive the victims of their property. The Defendant is not entitled to relief on this basis.

**B.**

**Identity Theft**

The Defendant contends that the evidence is insufficient to support his identity theft conviction. He argues that the indictment specified the Defendant stole Ms. Pettit's identity and that because Mr. and Ms. Pettit each testified having ownership of the debit card, the State did not prove the card belonged to Ms. Pettit. The State responds that the evidence is sufficient.

Tennessee Code Annotated section 39-14-150(b)(1) states, in relevant part, "A person commits the offense of identity theft who knowingly obtains, possesses, buys, or uses, the personal identifying information of another . . . [w]ith the intent to commit any unlawful act including, but not limited to, obtaining or attempting to obtain . . . goods . . . in the name of such other person" without the consent of the other person. Personal identifying information includes, in relevant part, the following: "Name, social security number, date of birth, official state or government issued driver license[,] . . . [u]nique electronic identification number, address, routing code or other personal identifying data which enables an individual to obtain merchandise or service[.]" *Id*. § 39-14-150(e).

In the light most favorable to the State, the record reflects that when Officer Russell searched the Defendant, the Defendant was holding a Kroger receipt in his hand. The receipt reflected a purchase of food items made with a debit card with the

last four digits 4923. Officer Russell testified that the black garbage bag contained frozen shrimp. The black bag and the red bag contained several of the Pettits's other stolen items. Ms. Pettit testified that the last four digits of her stolen card were 4923 and that unauthorized charges were reflected in the account connected to her missing card. A reasonable jury could have found beyond a reasonable doubt that the debit card belonged to Ms. Pettit and that the Defendant used Ms. Pettit's card without her consent. We note that Mr. Pettit testified that the card belonged to him, but Mr. Pettit also testified that "[Ms. Pettit's] debit and credit cards" were stolen and that unauthorized charges were made on "our Bank of Missouri debit card." The testimony established that the debit card either belonged to Ms. Pettit solely or to both Mr. and Ms. Pettit jointly. Proof of Mr. Pettit's concurrent ownership of the debit card does not negate Ms. Pettit's ownership of the account connected to the missing card. In any event, any conflicts in the evidence were resolved in the State's favor by the jury's verdict. We conclude that the evidence is sufficient to support the Defendant's conviction, and the Defendant is not entitled to relief on this basis.

## C.

### Fraudulent Use of a Credit Card

The Defendant contends that the evidence is insufficient to convict him of fraudulent use of a credit card, arguing that the Kroger receipt's listing only the last four numbers of a debit card is insufficient to prove the card was the same card stolen from Ms. Pettit. The State responds that the evidence is sufficient to establish that the card used at Kroger was the card stolen from Ms. Pettit.

Tennessee Code Annotated section 39-14-118(b) states, in relevant part, "A person commits the crime of fraudulent use of a credit or debit card who uses . . . a credit or debit card . . . for the purpose of obtaining property . . . with knowledge that" the card is stolen or that the use of the card is unauthorized by the person to whom the card is issued.

In the light most favorable to the State, the record reflects Mr. Pettit's testimony that the first location for the missing iPhone produced by the tracking application corresponded to a Kroger grocery store. The iPhone was later recovered from the Defendant's bag, and when Officer Russell searched the Defendant, he was holding a Kroger receipt in his hand. The receipt reflected a purchase made with a debit card with the last four digits 4923. Officer Russell testified that the black garbage bag contained the items described on the purchase receipt. Ms. Pettit testified that the last four digits of her stolen debit card were 4923 and that her account connected to the missing card reflected unauthorized charges. A reasonable jury could have found that the debit card belonged to Ms. Pettit and that the Defendant used the card to make a purchase knowing

-10-

the card was stolen.  We conclude that the evidence is sufficient to support the Defendant's conviction, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.


_____
ROBERT H. MONTGOMERY, JR., JUDGE